IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Melanie Jones, ) | C/A No.: 3:11-2623-CMC-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | |
| Midlands Neurology & Pain Associates, ) | |
| P.A.; and Eleanya O. Ogbonnaya, ) | |
| ) | |
| Defendants. ) | |
| ) | |

In this employment discrimination case, Melanie Jones ("Plaintiff") is suing her former employer Midlands Neurology & Pain Associates, P.A. ("MNPA") and its managing doctor, Eleanya Ogburu-Ogbonnaya[1] ("Dr. Ogburu"), in his individual capacity (collectively "Defendants"). Plaintiff alleges the following causes of action: (1) sex discrimination, hostile work environment, and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); (2) failure to pay overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"); (3) assault; (4) battery; (5) negligent supervision; and (6) wrongful termination in breach of public policy.[2]

This matter comes before the court on Defendants' motion for summary judgment, filed on August 2, 2103. [Entry #56]. Plaintiff filed a response [Entry #60] on August

---

[1] According to Defendants, the correct name for defendant is Eleanya Ogburu-Ogbonnaya and his last name is Ogburu. [Entry #7-1 at n.1].

[2] Plaintiff consents to dismissal of her defamation claim [Entry #60 at 21], and the undersigned recommends it be dismissed.

28, 2013, Defendants filed a reply [Entry #63] on September 9, 2013, and Plaintiff filed a sur-reply[3] [Entry #64] on September 16, 2013. This matter having been fully briefed, it is ripe for disposition. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends Defendants' motion for summary judgment be granted in part and denied in part.

I.     Factual Background

The following facts are presented in the light most favorable to Plaintiff. On December 8, 2009, MNPA hired Plaintiff as a phlebotomist. [Entry #60-2 at 13]. Plaintiff alleges that during her employment at MNPA, Dr. Ogburu asked her and other employees about their experiences with and affinity for oral sex. [Entry #60-4 at 12–13]. Plaintiff testified that in February 2010, she asked Dr. Ogburu for a topical anesthetic. *Id.* at 8–9. When Dr. Ogburu questioned Plaintiff about why she needed it, she told him that she had a waxing appointment. Plaintiff states that Dr. Ogburu gave her the anesthetic, but told her that she did not need it because he could "shave it and kiss it for [her] too." *Id.*

Plaintiff further testified that in February 2010, in the presence of two male

---

[3] Under Local Civil Rule 7.07 (D.S.C.), "[r]eplies to responses are discouraged." Further, the Local Civil Rules make no provision for sur-replies. Plaintiff did not seek or obtain leave to file a sur-reply. Accordingly, the sur-reply is not properly before the court. Even considering it, however, it does not change the court's analysis of the legal issues and its recommendations herein.

cowokers, Dr. Ogburu lined up Plaintiff and another female coworker next to each other for the purpose of comparing them and determining which of them had the larger posterior. According to Plaintiff, Dr. Ogburu touched her rear end while measuring it with his hands. *Id*. at 9–11.  Plaintiff also testified that on multiple occasions, Dr. Ogburu touched her rear end as they passed each other in the office, claiming it had been an accident. *Id*. at 23.

On March 26, 2010, Dr. Ogburu hosted an office celebration in honor of his birthday at Hooters after business hours. [Entry #34 at  ¶ 13]. According to Plaintiff, she initially did not plan to attend, but Dr. Ogburu called her on her personal cellphone at 7:35 p.m. and told her that "we're all at Hooters" and asked where she was. [Entry #56-5 at 24]. Plaintiff testified that after Dr. Ogburu's call, she felt compelled to attend or risk losing her job. *Id*. at 25. When Plaintiff arrived, only two other employees were present with Dr. Ogburu. *Id*. at 27. They were at a booth, and Dr. Ogburu rose from his seat such that Plaintiff felt compelled to sit on the inside of the booth next to him. *Id*. Approximately one hour after Plaintiff arrived at Hooters, a third coworker, Angela Black, arrived and "deep throat" shots were ordered. *Id*. at 27, 29. According to Plaintiff, she and Black "were positioned to see who could do" the shots. *Id*. at 29. Plaintiff testified that a deep throat shot requires the drinker to put her mouth around the entire circumference of a shot glass and lift the glass without hands to swallow the liquor. *Id*. Plaintiff and Black took the deep throat shots. *Id*. at 31.

Plaintiff alleges that while she and Dr. Ogburu were seated at the booth, he placed his hand on her leg and began to rub it through her dress. *Id*. Plaintiff testified that she

3

protested Dr. Ogburu's behavior by removing his hand from her leg and sliding away from him. *Id*. at 32. She also told him to stop rubbing her leg. *Id*. According to Plaintiff, Dr. Ogburu then leaned over to her and whispered in her ear that he wanted to take her to the hotel behind Hooters to have sex. *Id*. at 34. When Plaintiff declined, Dr. Ogburu allegedly pleaded for her to "come on" and told her that he was going to text her the room number in thirty minutes. *Id*.

Plaintiff testified that in the weeks following the Hooters incident, Dr. Ogburu offered to take her with him on a trip to Washington, D.C., if she would sign a contract. *Id*. at 126. Plaintiff testified that Dr. Ogburu gave her no details regarding the content of the contract. *Id*. Plaintiff testified that she complained about Dr. Ogburu's behavior to Bridget Ogburu,[4] the office manager for MNPA and Dr. Ogburu's sister. [Entry #60-4 at 21–22]. Plaintiff said that Bridget Ogburu did not address her complaint and told Plaintiff that she did not "have time to listen to this mess." *Id*. at 22.

In June 2010, MNPA reduced Plaintiff's work hours to seven or eight hours per week, although she had informed them that she could work 32 hours. *Id*. at 4. On June 16, 2010, Plaintiff applied for unemployment benefits based on the reduction in her hours. [Entry #60-8, #60-9]. On June 23, 2010, MNPA contested Plaintiff's unemployment claim. [Entry #60-9]. Plaintiff was deemed eligible for benefits on June 29, 2010, with an effective date for benefits retroactive to June 13, 2010. [Entry #60-8]. On July 2, 2010, Bridget Ogburu requested Plaintiff sign a revised employment application that purportedly placed qualifications on her rights to unemployment compensation. [Entry

4

#60-10]. According to Plaintiff, when she tried to make a copy of the revised employment application, Bridget Ogburu jumped on her back. [Entry #56-5 at 8–10]. After further confrontation about Plaintiff's photocopying the application, Bridget Ogburu called 911, and the police were dispatched to the office. *Id.* at 11. Plaintiff was later informed that she should not return to the office. *Id.* at 12, 15–16.

Plaintiff testified that she was often asked to work late while employed at MNPA, but was not paid overtime. [Entry #56-5]. After Plaintiff's termination, the United States Department of Labor, Wage and Hour Division ("DOL"), conducted a four-month audit and investigation at MNPA, resulting in a finding that Plaintiff, among others, was due unpaid wages. [Entry #7-2 at 3; Entry #7-3 at 3–4]. MNPA sent a check to Plaintiff for the amount of unpaid wages found by DOL. *Id*. Plaintiff cashed the check and understood that it was payment for overtime wages. [Entry #56-5 at 41–42]. There is no evidence that Plaintiff signed or received a notice explaining that acceptance of the check waived any other rights she may have had under the FLSA.

Plaintiff filed this complaint in federal court on September 29, 2011, under federal question jurisdiction for Title VII discrimination.

II.     Discussion

    A.     Standard on Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit

---

[4] Bridget's last name was formerly Owoh and is sometimes referenced as Ogbonnay.

under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255.

B.   Analysis

    1.   Plaintiff's Title VII Claims

An employer must have fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year in order to be covered by Title VII. 42 U.S.C. § 2000e. MNPA asserts that it is not an employer pursuant to Title VII because it did not employ the requisite number of employees. [Entry #56-1 st 2–7]. In response, Plaintiff submitted a chart purporting to show every employee of MNPA during the year 2010[5] and the weeks they worked. [Entry #60-11]. Defendants argue that Plaintiff incorrectly asserts that Doris Drakeford, Elnora Christian, Tricia Pollard, Sidara Allen, Chester Gardner, Daniel Epps, and Florence Ogburu were MNPA employees during 2010 and that Amartha and Haniel Ogburu were employed for longer than a month each in 2010. [Entry #63 at 1–4].

    a.   Drakeford and Christian

Plaintiff argues that Drakeford and Christian should be counted as employees

---

[5] Plaintiff has not argued that MNPA employed 15 or more employees for 20 or more weeks in 2009.

6

based on records titled "Census Data Verification" from MNPA's third-party administrator for retirement benefit funds. [Entry #60 at 7; #60-13]. Defendants argue that the retirement records show only that Drakeford and Christian were among "employees, dependents, and other group plan participants." [Entry #63 at 2; #60-13]. Defendants submitted an affidavit from MNPA Office Manager Bridget Ogburu in which she avers that the employment of Drakeford and Christian ended prior to 2010, but admits that they may have still participated in the retirement plan. [Entry #63-2]. Despite discovery of all payroll records, timecards, and the depositions of several witnesses regarding MNPA's employees in 2010, Plaintiff has presented no further evidence that MNPA employed Drakeford and Christian in 2010. No reasonable juror could conclude that the records from MNPA's third-party administrator for retirement benefit funds, standing alone, are sufficient to prove that Drakeford and Christian were employees of MNPA during 2010.[6] Therefore, the undersigned recommends Drakeford and Christian not be counted towards MNPA's number of employees for Title VII purposes.

      b.    Pollard

Plaintiff also argues that "Tricia Pollard, who worked for Midlands Neurology through a vendor, Pope Diagnostic, likewise was employed for the entire 2010 calendar year." [Entry #60 at 7]. Plaintiff provides no support for this contention. *Id*. In their reply,

---

[6] The records also list Drakeford and Christian in the records for 2011 and 2012. Therefore, under Plaintiff's argument, Drakeford and Christian remained employees during the time this case has been litigated, despite the absence of any other evidence of their employment in any of the records produced by Defendants and third parties in discovery.

Defendants point out that Pollard is not shown in any of MNPA's payroll records or underlying time cards. [Entry #63 at 2]. Plaintiff did not address Pollard's alleged employment in her sur-reply. [Entry #64]. No reasonable juror could find that Plaintiff has shown that Pollard was an employee of MNPA during 2010, and the undersigned recommends she not be counted as an employee of MNPA for Title VII purposes.

### c.     Amartha and Haniel Ogburu

Finally, Plaintiff has not shown that Dr. Ogburu's daughters, Amartha and Haniel, should be counted as employees for more than a few weeks each in the summer of 2010. Plaintiff's only evidence for counting Amartha and Haniel as employees past the summer dates in which they received paychecks[7] is that they do not have a notation in their personnel file that they have been terminated, as was the practice of MNPA. [Entry #60 at 11-12].[8] Plaintiff also alleges "an ongoing employment relationship with [MNPA] by virtue of payments that [MNPA] continued to make on their behalf." [Entry #64 at 4]. However, the only evidence of alleged ongoing payments is a one-time check to Amartha in May 2011 for "professional development," with the notation "Germany trip." [Entry #60-27]. Otherwise, the record is devoid of reference to Amartha and Haniel after their work during the summer of 2010.

"[T]he ultimate touchstone under § 2000e(b) is whether an employer has

---

[7] The evidence shows that Amartha was hired on May 20, 2010, and received two bi-weekly paychecks. [Entry #60-23, #7-3 at 12–17]. Haniel was hired on June 23, 2010, and also received two bi-weekly paychecks. [Entry #60-24, #7-3 at 12–17].
[8] Amartha's employment application is in the record at Entry #60-23. Haniel's employment record is not in the record.

8

employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question." *Walters v. Metropolitan Educational Enterprises, Inc*. 519 U.S. 202, 212 (1997). Here, Plaintiff provides no evidence that Amartha and Haniel had a continuous employment relationship with MNPA after their respective summer employment. Amartha's employment application states she applied for a "front desk; summer intern position on May 5, 2010, and indicated that she was able to work "summer 2010 but May 19 – June1; June 19 – July [illegible]." [Entry #60-23 at 10]. Further, the application noted that she was "currently a college student." *Id*. at 5. No reasonable juror could find that the absence of a termination date notation on their employment applications is sufficient to show that Amartha and Haniel had employment relationships with MNPA on each working day in every week for the remainder of 2010 in light of the undisputed evidence that they performed no work for MNPA after the summer. [Entry #60-23, #60-24, #7-3 at 6-19].

Additionally, one check to Amartha for professional development in 2011 does not constitute evidence of a continued employment relationship during the remainder of 2010. Although Plaintiff points out that the *Walters* Court found that "an individual who works irregular hours, perhaps only a few days a month," will be counted toward the 15-employee minimum for every week in the month, 519 U.S. at 210, the Court was referring to part-time employees and did not discuss employees who did not perform work or receive compensation for a year at a time, such as Amartha. Here, Plaintiff has provided no evidence of a continuing employment relationship between MNPA and Dr. Ogburu's daughters, Amartha and Haniel, after the summer of 2010. Therefore, no

9

reasonable juror could find that Amartha and Haniel remained MNPA's employees after they ceased working in the summer of 2010, and the undersigned recommends they not be counted as employees for Title VII purposes for the weeks they did not receive a paycheck.

### d. Revised Chart

When Plaintiff's chart of employees is revised to (1) omit Drakeford, Christian, Pollard, (2) omit Amartha and Haniel Ogburu after their respective employment, and (3) account for what appear to be scrivener's errors,[9] the results show that MNPA did not employ 15 employees for each working day of the requisite twenty weeks in 2010. Therefore, it is not necessary for the court to address the parties' arguments with regard to Chester Gardner, Daniel Epps, Florence Ogburu, or Sidara Allen. The undersigned recommends Defendants be granted summary judgment on Plaintiff's Title VII claims, as Plaintiff has failed to show that the statute applied to MNPA in 2010.

### 2. Plaintiff's FLSA claim

After Plaintiff's termination, DOL conducted a four-month audit and investigation of MNPA that resulted in a finding that Plaintiff was due unpaid wages. [Entry #7-2 at 3; Entry #7-3 at 3–4]. Defendants contend that Plaintiff's FLSA claim should be dismissed

---

[9] For instance, Plaintiff states that Bryant was hired on June 1, 2010, and her employment ended on August 4, 2010, [Entry #60 at 12], but Plaintiff's chart indicates counts Bryant as working four additional weeks [Entry #60-11]. The court also notes that the chart improperly counts some employees during a week in which their employment began or ended in the middle of the week. *See Walters,* 519 U.S. 202, 209 (1997) (finding that an employee who arrives or departs in the middle of a calendar week does not count toward that week's 15-employee minimum used to determine whether employer is within statutory definition of "employer" subject to Title VII for relevant year).

because MNPA previously paid her the amount of wages DOL found was due, and Plaintiff accepted the payment by cashing the check. [Entry #56-1 at 11]. Plaintiff argues that her "acceptance of the payment does not waive her entitlement to liquidated damages on the amount or to recover attorney's fees." [Entry #60 at 19].

> The relevant portion of the FLSA states as follows:
>
> The Secretary is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this title, and <u>the agreement of any employee to accept such payment</u> shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages.

29 U.S.C. § 216(c) (emphasis added). Defendants have not provided any information indicating that Plaintiff was informed of the reason for the payment when she received it or was informed or aware that accepting such payment would constitute a waiver of her rights under the FLSA. Defendants' December 21, 2011, letter to DOL affirmatively indicates that Plaintiff did not execute a Form WH-58, the form typically used by DOL to provide notice and confirm agreement. [Entry #60-32]. The record is silent as to whether Plaintiff received the WH-58. Plaintiff testified that she received the check from Defendants and understood it to be payment for overtime wages as a result of her DOL complaint. [Entry #56-5 at 40–42].

The Fourth Circuit has not determined whether an employee can waive her FLSA rights by cashing a check for overtime wages. The majority of courts that have reviewed this issue have found that "'agreement' is more than the acceptance of funds, as it must

11

exist 'independent of payment.'" *Dent v. Cox Commc'ns Las Vegas, Inc.*, 502 F.3d 1141, 1146 (9th Cir. 2007) (citations omitted). "Where notice is lacking, meaningful agreement—and thus valid waiver—cannot be found." *Id.*; *see also Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir. 1986) (finding that cashing a check without evidence of agreement does not waive claims under the FLSA); *Favata v. National Oilwell Varco*, L.P., 2013 WL 1222378, *3, Case No. C-12-82 (S.D. Tex. Feb. 7, 2013) (same); *Zhengfang Liang v. Cafe Spice SB, Inc*., 911 F.Supp.2d 184, 198 (E.D.N.Y 2012) (finding that notice of waiver of rights is required). Because there is no evidence that Plaintiff had notice that acceptance of the check constituted a waiver of her FLSA rights, there is no evidence that she agreed to such terms. Therefore, the undersigned recommends Defendants' motion for summary judgment be denied with respect to Plaintiff's FLSA claim.

        3.        Assault and Battery against Dr. Ogburu

Plaintiff alleges Dr. Ogburu assaulted and battered her. Under South Carolina law, an assault occurs when a person has been placed in reasonable apprehension of bodily harm by the conduct of another. *Moody v. Ferguson*, 732 F. Supp. 627, 632 (D.S.C. 1989). A battery takes place when one person makes any forcible contact on the person of another. *Gathers v. Harris Teeter Supermarket, Inc.*, 317 S.E.2d 748, 754–55 (S.C. Ct. App. 1984). Forcible contact means the "actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree; it is unnecessary that the contact be by a blow, as any forcible contact is sufficient." *Id*. at 754.

Here, Plaintiff testified that Dr. Ogburu touched parts of her body, including her

posterior and her leg, that this touching was unwanted, and that it caused her to fear him. [Entry #60-4 at 16, 23, 27–28]. Defendants argue that Plaintiff has suffered no actual damages. However, South Carolina law allows the presumption of nominal damages from an invasion of another's rights. *Stevens v. Allen*, 536 S.E.2d 663, 666 (2000) ("[E]very violation of a legal right imports damage and authorizes the maintenance of an action and the recovery of at least nominal damages, regardless of whether any actual damage has been sustained.") (citing *Jones v. Atl. Coast Line R. Co.*, 94 S.E. 490, 491 (S.C. 1917), overruled in part on other grounds by *Santee Portland Cement Co. v. Daniel Intl*, 384 S.E.2d 693 (S.C. 1989)). Therefore, the undersigned recommends that Defendants' motion for summary judgment be denied with respect to Plaintiff's assault and battery claims against Dr. Ogburu.

          4.       Negligent Supervision Claim

Plaintiff's negligent supervision claim is based on Defendants' alleged negligent supervision of Bridget Ogburu. Specifically, Plaintiff testified that when she was making a copy of a revised employment application that Defendants requested she sign, Bridget Ogburu "jumped on her from behind" in an effort to obtain the application. [Entry #60-4 at 7].

To show that an employer has been negligent in the supervision of its employee, the plaintiff must show that the employee intentionally harmed another when the employee is on the employer's premises, that the employer has reason to know of its ability to control the employee, and that the employer knows or should know of the necessity to control the employee. *Degenhart v. Knights of Columbus*, 420 S.E.2d 495,

13

496 (S.C. 1992). Here, Plaintiff has failed to prove a cause of action for negligent supervision because Plaintiff has provided no argument or evidence that shows Defendants knew or should have known of the necessity to control Bridget Ogburu or that she posed an undue risk of harm. *Bank of New York v. Sumter County*, 691 S.E.2d 473, 478 (S.C. 2010) (finding no liability where employer did not know that its employment of a specific person created an undue risk of harm); *James v. Kelly Trucking Co.*, 661 S.E.2d 329, 331 (S.C. 2008) (same); *see also Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (denying a supervisory liability claim because a supervisor cannot reasonably be expected to guard against the improper acts of his properly trained employees when he has no basis upon which to anticipate the misconduct). Therefore, the undersigned recommends Defendants be granted summary judgment on Plaintiff's negligent supervision claim.

          5.          Wrongful Termination in Violation of Public Policy

Plaintiff's claim for wrongful termination in violation of public policy is based on her allegation that she was terminated in retaliation for filing for unemployment benefits. [Entry #60 at 22–23]. On June 16, 2010, Plaintiff applied for unemployment benefits based on the reduction in her hours. [Entry #60-8, #60-9]. Although MNPA opposed her unemployment claim, Plaintiff was deemed eligible for benefits on June 29, 2010, retroactive to June 13, 2010. [Entry #60-8]. Three days later, on July 2, 2010, Bridget Ogburu requested Plaintiff sign a revised employment application that purported to place qualifications on her rights to unemployment compensation. [Entry #60-10]. Specifically the application states that "In the event of employment, I understand that false or

misleading information given in my application or interview(s) may result in discharge without any kind of job/employment benefits. [Entry #60-10 at 2]. According to Plaintiff, when she tried to make a copy of the revised employment application, Bridget Ogburu jumped on her back. [Entry #60-4 at 5–7]. After further argument about the application, Bridget called 911 and the police were dispatched to the MNPA office. *Id*. Plaintiff was later informed that she should not return to the office. [Entry #56-5 at 12, 15–16].

Although South Carolina recognizes the presumption of at-will employment, the public policy exception to the at-will doctrine provides an employee with a cause of action if her termination violates public policy. *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213, 216 (S.C. 1985). The South Carolina Supreme Court, however, has held that the public policy exception is not limited to "situations where the employer asks the employee to violate the law or the reason for the termination itself is a violation of criminal law," but rather applies whenever "there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy." *Barron v. Labor Finders of S.C.*, 713 S.E.2d 634, 637, 638 (S.C. 2011). The determination of what constitutes public policy is a question of law for the courts to decide. *Id*. at 638.

Plaintiff notes the law of South Carolina provides the following with regard to unemployment compensation:

> Economic insecurity due to unemployment is a serious menace to health, morals and welfare of the people of this State; involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the General Assembly to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family; the achievement of social security requires protection against this greatest hazard of our economic life; this

15

> can be provided by encouraging the employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The General Assembly therefore declares that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

S.C. Code Ann. § 41-27-20 (1986).

In the instant case, Plaintiff has shown that she applied for unemployment benefits and was terminated three days after she was deemed eligible. Additionally, she was terminated after a confrontation resulting from MNPA's request that she sign a revised employment application purporting to place qualifications on her rights to unemployment compensation. It is a novel issue whether the termination of an at-will employee in retaliation for obtaining unemployment benefits constitutes a violation of public policy in South Carolina. If the district judge finds that such activity is a violation of South Carolina public policy, the undersigned recommends Defendants be denied summary judgment on Plaintiff's claim for wrongful termination in violation of public policy.

III.   Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that Defendants' motion for summary judgment be granted as to Plaintiff's Title VII claims and negligent supervision claim and denied as to her claims for failure to pay overtime wages, assault, battery, and wrongful termination in violation of public policy. The undersigned also recommends Plaintiff's defamation claim be dismissed pursuant to her voluntary

withdrawal of that claim [Entry #60 at 21].

    IT IS SO RECOMMENDED.

*Shiva V. Hodges*

September 20, 2013                          Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).